## EASTERN GRAIN, MILL & ELEVATOR CORPORATION v. BUFFALO S. S. CO.

(District Court, W. D. New York. June 7, 1926.)

**1. Shipping ⊗⇒121(1)—Seaworthiness of vessel contracting for grain storage is implied.**

Contract for storage of grain in a vessel is one of carriage, and seaworthiness for the purpose is implied.

**2. New trial ⊗⇒71—New trial will not be granted, on ground verdict was against evidence, where evidence was conflicting.**

New trial will not be granted, on ground that verdict was against weight of evidence, where testimony was conflicting, although different conclusion might have been reached, had case been tried without jury.

**3. Evidence ⊗⇒553(1)—Expert testimony of effect of inherent moisture in grain containing maximum moisture content held not prejudicial, on assuming no other water came in contact therewith.**

In action for damages to cargo of grain stored in vessel during winter, expert testimony as to effect of inherent moisture in grain containing maximum moisture content *held* not prejudicial, where it was assumed in hypothetical question that no water from outside came into cargo.

**4. New trial ⊗⇒32—Admitting testimony that insurance company would indemnify plaintiff for damage to grain stored in vessel during winter held prejudicial error.**

In action for damage to cargo of grain stored in vessel during winter, admitting testimony to effect that insurance company was interested, and would indemnify plaintiff for loss, *held* prejudicial error.

At Law. Action by the Eastern Grain, Mill & Elevator Corporation against the Buffalo Steamship Company. On plaintiff's motion to set aside verdict for defendant. Verdict set aside, and new trial granted.

Brown, Ely & Richards, of Buffalo, N. Y., for plaintiff.

Thomas C. Burke, of Buffalo, N. Y., and Goulder, White & Garry, of Cleveland, Ohio, for defendant.

HAZEL, District Judge. Motion to set aside verdict. In this action at law the jury found a verdict in favor of the defendant for no cause of action. It appeared on the trial that the steamer Kennedy was chartered by plaintiff to take aboard a cargo of grain at its elevator for storage during the winter of 1921–22, and make return delivery in April, 1922, the vessel meanwhile to lay at the breakwater in Buffalo harbor. Provision was made in the charter for paying freight, tow bills, and expense for handling and unloading at the dock. After the cargo was laden, a bill of lading was issued on the Lake Carriers' printed form by agents of the vessel, acknowledging receipt of 473,904 bushels of oats in apparent good condition and agreeing to deliver in like condition, excepting damage or loss from certain specified causes.

There was evidence that, to bring the grain which had arrived at plaintiff's elevator in the steamers Billings and Pierce up to grade No. 2 from No. 3, it was mixed with grade 3 white oats which had arrived on the steamer Clement, and which weighed more than the test weight of grade 2, comprising the cargoes on the Billings and Pierce. The latter cargoes had been inspected and graded at Chicago by competent state and federal inspectors connected with the Department of Agriculture. On the arrival of the three steamers at plaintiff's elevator, their cargoes were elevated into separate bins, and afterwards, in November, 1921, to make room in the elevator for grain arrivals before the close of navigation, the steamer Kennedy was chartered, as before mentioned, to load and hold grain during the winter. The loading was under inspection of an employee of the Corn Exchange of Buffalo, two spouts being used; the inspector standing by and feeling the grain at intervals, in the customary way, to bring it up to standard grade No. 2, as determined by the state and federal Departments of Agriculture.

On April 6th, the Kennedy came to the elevator from the breakwall for unloading the storage grain, and damage was discovered under hatch 29, the first hatch uncovered. Investigation immediately ensued, and damaged grain was found on the top under 19 hatches out of a total of 32 hatches. It was wet, heated, or musty, and in most instances the damaged grain was underneath the center of the hatch opening. There was testimony by the inspector and other witnesses that, when the Kennedy was loaded, the grain was cool and sweet. There was hardly any dispute as to the grain damage in the center of the various hatches, or under the right side or left side of the hatch covers.

The complaint alleged that the storage contract constituted a bailment, the vessel becoming liable as a warehouseman, and that defendant had supplied an unseaworthy vessel improperly equipped to keep the grain, during the storage period, in proper condition, and that in consequence thereof water leaked through the hatch covers and tarpaulins placed over them onto the cargo. The answer denied negligence, and asserted that the cargo was in bad condition when loaded, and its wet, moist, or mouldy condition at

time of unloading was due thereto; that the grain had a natural vice and defect, which developed during the winter storage.

[1] A contract for storage of grain in a vessel is, as was substantially decided in The Jungshoved (C. C. A.) 290 F. 733, one of carriage, and seaworthiness for the purpose is implied. There was much testimony tending to show that various tarpaulins placed on the hatch covers were old, worn, and patched, and that spots of water collected in them in depressions and dents.

This motion is based on the grounds: (1) That the verdict was against the weight of the evidence; (2) that the hypothetical question propounded to expert witnesses by defendant, relating to the inherent moisture of the grain, was improper; and (3) that it was error to permit two of plaintiff's witnesses to be asked as to insurance on the cargo.

[2] 1. Inasmuch as there was some testimony that the tarpaulins and hatch covers were watertight, even though various witnesses for plaintiff testified to contrary inferences, I do not think that a retrial on that ground should be granted. It is, of course, possible that a different conclusion might have been reached by the court, had the case been tried without a jury; yet the jury was the judge of the sufficiency of the evidence as bearing on this point.

[3] 2. I am not convinced that it was error to receive the expert testimony of Drs. Alcott and Bailey, who were questioned as to the effect of inherent moisture in grain generally, and to explain the possible result of the condition of the oats as embodied in the hypothetical question. It is true that a maximum of 14½ per cent. of moisture content was allowable in the different grades of oats mixed and loaded into the Kennedy, and no excess moisture was shown. Since, however, the percentage of the moisture content was finally embodied in the question, and the witness assumed that no water from the outside came into the cargo, I am unable to perceive at this time how the answer was prejudicial. As bearing upon the competency of the hypothetical questions, the case of Fredrick Mfg. Co. v. Devlin, 127 F. 71, 62 C. C. A. 53, seems to me to be quite close. There an expert witness was permitted to testify as to whether breakages in castings were "due to the inexpedient use of castings, instead of forgings, and not to inherent defects in the material used." But, as the competency of the question is not free from doubt, no positive rule is stated by me, especially as I have determined that there must be a retrial of the case on the third ground, which will now be discussed.

[4] 3. It was error, in my opinion, to permit counsel for defendant to cross-examine the witnesses Jordan and Gaskin in such a way as to indicate to the jury that an insurance company was interested in the outcome of the trial. On reflection, I am fully persuaded that the interrogation was not for the mere purpose of affecting the credibility of the witnesses, but was conducted to have the jury understand that an insurance company was pecuniarily interested and would indemnify the plaintiff for its loss. In Simpson v. Foundation Co., 201 N. Y. 479, 95 N. E. 10, Ann. Cas. 1912B, 321, a somewhat similar question was presented. The action was for negligence, and it was drawn out that defendant was insured in a casualty company. The learned court ruled that evidence of such a nature was "incompetent, and so dangerous as to require a reversal, even when the court strikes it from the record and directs the jury to disregard it, unless it clearly appears that it could not have influenced the verdict." See, also, Hordern v. Salvation Army (124 App. Div. 674, 109 N. Y. S. 131).

The verdict must be set aside, and a new trial granted.